## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 19 2019, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Todd George,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

March 19, 2019

Court of Appeals Case No.
18A-CR-1974

Appeal from the Tippecanoe
Superior Court

The Honorable Randy J. Williams,
Judge

Trial Court Cause No.
79D01-1705-F2-9

**Bradford, Judge.**

# Case Summary

[1] In 2017, Todd George and L.G. were married but involved in a pending divorce. One evening in early May, George went to L.G.'s residence and confronted her about money she had withdrawn from their joint bank account. During the ensuing confrontation, George battered L.G. with both a metal bar and his fist, bound her with duct tape and zip ties, and abducted her. L.G. was injured during the confrontation, requiring eighteen staples to close lacerations on her head. George was charged with and found guilty of numerous crimes, including elevated charges of Level 2 felony burglary, Level 3 felony kidnapping, Level 5 felony domestic battery, and Level 5 felony intimidation. He was sentenced to an aggregate term of thirty-one years.

[2] George contends that: (1) the evidence is insufficient to sustain his elevated convictions, (2) the trial court abused its discretion in admitting certain evidence, (3) his convictions violate the prohibitions against double jeopardy, and (4) the trial court abused its discretion in limiting his cross-examination of L.G. We affirm.

# Facts and Procedural History

[3] On March 7, 2017, L.G. filed for divorce and moved out of the marital residence she had shared with George. After leaving work on May 2, 2017, L.G. drove to Frankfort and withdrew $1000 from a joint bank account she had with George. L.G. then drove to the Lafayette residence she shared with her

friend Dan Marsh. Marsh worked nights and was not home when L.G. returned to the residence. L.G. went to bed at approximately 8:30 or 9:00 p.m.

[4] At some point that evening or early the next morning, L.G. was awakened by George standing over her bed. George "had hit [her] on the head with a metal bar and [she] was bleeding pretty bad." Tr. Vol. II p. 54. George and L.G. struggled as George continued to strike her with the metal bar, striking her a total of three or four times. He then "straddled" and punched her "three or four" times. Tr. Vol. II pp. 54. Throughout the attack, George threatened to kill L.G. and asked her "where's my fuc[****] money bi[***]?" Tr. Vol. II p. 55.

[5] After the initial attack subsided, George permitted L.G. to use the restroom. While L.G. was in the restroom, George "pulled out a roll of duct tape and put it on [L.G.'s] mouth and then went around [her] whole head four times." Tr. Vol. II p. 55. He also "zip tied" L.G.'s hands behind her back "as if [she] were in handcuffs." Tr. Vol. II p. 56. George then led L.G. to her vehicle and drove away from the residence.

[6] George drove L.G.'s vehicle to his place of employment where he transferred L.G. to his vehicle. L.G. observed that the metal bar with which he had hit her was "down on the floorboard by [George's] feet." Tr. Vol. II p. 69. While driving, George threatened to kill L.G. and her family if she "did not help him get out of the trouble" that he was in. Tr. Vol. II p. 69. George also

interrogated L.G. about the nature of her relationship with Marsh and hit her in the head several times.

[7] George again threatened L.G. when they arrived at the marital residence, telling her "take your last breath of fresh air, bi[***]" before taking her inside. Tr. Vol. II p. 70. Once inside, George looked at L.G. and said "What have I done? Oh my gosh, I'm so sorry." Tr. Vol. II p. 70. George removed the zip ties from L.G.'s wrists and the duct tape from her face.

[8] At some point, George became concerned that Marsh would call the police upon discovering the condition of his residence and L.G. missing. He instructed L.G. to attempt to clean herself up before driving her to a hotel in Indianapolis. While en route to the hotel, George sent Marsh a text message from L.G.'s phone apologizing for the damage to the residence and indicating that L.G. still loved and was moving back in with George.

[9] Upon arriving at the hotel and reserving a room, George escorted L.G. in through a side door. The next morning, L.G. slipped a note with their room number and a request for help to a hotel staff member at the front desk when she and George went to get breakfast. After breakfast, George and L.G. went back to their room. Within a few minutes, the hotel manager knocked on the door and asked "is everything okay[?]" Tr. Vol. II p. 78. L.G. was able to escape from the room while George spoke to the hotel manager. Police were summoned to the hotel and L.G. was transported to the hospital.

[10] Angela Morris, a certified forensic nurse, examined L.G. and documented twenty-six injuries, including two large lacerations on L.G.'s head which required a total of eighteen staples. L.G. also suffered "a massive amount of swelling and bruising" on her face, bruising on her arms and lips, bilateral wrist injuries, and abrasions on both arms. Tr. Vol. II p. 134. Morris opined that based upon her training and experience, it appeared that L.G.'s injuries were caused by some kind of "blunt force trauma by an object, a larger object than … a human fist." Tr. Vol. II p. 146.

[11] At some point, Marsh returned home and reported L.G. missing. Investigating officers came to his residence and observed a broken front door, disarray in L.G.'s bedroom from an apparent struggle, blood, and zip ties. A subsequent search of the marital residence also uncovered zip ties, duct tape, hair, and a bloody night gown. After testing, it was determined that the blood recovered from the residences belonged to L.G.

[12] On May 10, 2017, the State charged George with Count I – Level 2 felony burglary, Count II – Level 3 felony kidnapping, Count III – Level 3 felony criminal confinement, Count IV – Level 3 felony robbery, Count V – Level 5 felony domestic battery, Count VI – Level 5 felony intimidation, Count VII – Level 6 felony intimidation, Count VIII – Level 6 felony residential entry, Count IX – Class A misdemeanor theft, and Count X – Class A misdemeanor invasion of privacy. The jury subsequently found George guilty of Counts I through III, Counts V through IX, and the lesser-included Level 5 felony robbery charge in Count IV. On August 6, 2018, the trial court sentenced

George to an aggregate thirty-one-year term.  In sentencing George, the trial court also vacated George's convictions for Counts III, VIII, and IX on double jeopardy grounds and merged Count VII into Count VI.

# Discussion and Decision

## I.  Sufficiency of the Evidence

[13]   George contends that the evidence is insufficient to sustain his elevated convictions for Level 2 felony burglary, Level 3 felony kidnapping, Level 5 felony domestic battery, and Level 5 felony intimidation.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict.  It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction.  To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.  It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence.  The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007) (citations, emphasis, and quotations omitted).  A conviction may be based on the uncorroborated testimony of a single witness "if the testimony is sufficient to convince the trier of fact beyond a reasonable doubt."  *Robinson v. State*, 446 N.E.2d 1287, 1291

(Ind. 1983) (providing that a victim's uncorroborated testimony was sufficient to sustain the defendant's conviction for child molesting).

[14] George does not challenge the sufficiency of the evidence to prove he committed burglary, kidnapping, domestic battery, or intimidation. He argues only that the evidence is insufficient to prove that he committed the offenses by means of or while armed with a deadly weapon. The definition of a "deadly weapon" includes any item "that in the manner it: (A) is used; (B) could ordinarily be used; or (C) is intended to be used; is readily capable of causing serious bodily injury." Ind. Code § 35-31.5-2-86. "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus." Ind. Code § 35-31.5-2-292.

> The question of whether a weapon is "deadly" is determined from a description of the weapon, the manner of its use, and the circumstances of the case. Whether an object is a deadly weapon based on these factors is a question of fact. The original purpose of the object is not considered. Rather, the manner in which the defendant actually used the object is examined. Also, it does not matter if actual injuries were sustained by the crime victim, provided the defendant had the apparent ability to injure the victim seriously through his use of the object during the crime.

*Gleason v. State*, 965 N.E.2d 702, 708 (Ind. Ct. App. 2012) (internal citations omitted).

L.G. unequivocally testified that George hit her on the head three or four times with a metal bar, which she later described as a crow bar. Indiana courts have previously found a metal bar or crow bar used in this fashion to be a deadly weapon. *See Hatton v. State*, 439 N.E.2d 565, 567 (Ind. 1982) (providing that a crow bar carried by the defendant during a robbery was a deadly weapon); *Clemons v. State*, 83 N.E.3d 104, 108 (Ind. Ct. App. 2017) ("[I]t is common sense that a metal rod used [to strike someone in the head] is capable of causing death, and as such, it is logically inescapable that such a weapon is also capable of causing serious bodily injury."). Given the Indiana Supreme Court's decision in *Hatton* and our conclusion in *Clemons* coupled with L.G.'s unequivocal testimony, we conclude the evidence is sufficient to prove that George committed the challenged acts by means of or while armed with a deadly weapon. George's claim to the contrary effectively amounts to a request that we reweigh the evidence, which we will not do. *See Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002) ("We do not reweigh the evidence or assess the credibility of witnesses.").

## II.  Admission of Evidence

George next contends that the trial court abused its discretion in admitting certain evidence.

> The admission or exclusion of evidence is entrusted to the discretion of the trial court. We will reverse a trial court's decision only for an abuse of discretion. We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. An abuse

of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law.

*Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012) (internal citations omitted). The trial court's ruling will be upheld "if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory." *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008).

[17] The State sought to introduce testimony from Morris regarding the cause of L.G.'s injuries. The trial court admitted some of the proffered testimony over George's objection. In challenging the admission of this testimony, George asserts that the State failed to establish that Morris, the forensic nurse who treated L.G., qualified as an expert witness.

[18] With respect to expert witnesses, the Indiana Rules of Evidence Rule provide that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Evid. R. 702(a).

> Under this rule, a witness may be qualified as an expert by virtue of knowledge, skill, experience, training, or education. And only one characteristic is necessary to qualify an individual as an expert. As such, a witness may qualify as an expert on the basis

of practical experience alone. It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness.

*Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003) (internal citations and quotations omitted).

[19] Review of the record reveals that Morris is an experienced certified forensic nurse examiner. In addition to her experience, Morris had undergone training relating to traumatic injuries and has specialized in providing appropriate "care for people who have been impacted by crime and violence." Tr. Vol. II p. 131. Morris testified that while she could not say with certainty what caused L.G.'s injuries because she was not present when the injuries were inflicted, based on her training and experience, she believed that L.G.'s injuries were consistent with "a blunt force trauma by an object, a larger object than … a human fist." Tr. Vol. II p. 146. Given Morris's training and experience as a certified forensic nurse, we cannot say that the trial court abused its discretion by allowing her to testify as to her observations within the limits of her experience. *See Swoaks v. State*, 519 N.E.2d 149, 150-51 (Ind. 1988) (providing that the trial court did not abuse its discretion by allowing a licensed nurse to testify as to her observations within the limits of her experience where the nurse did not testify as to the cause of the injuries but rather merely testified that the appellant's cuts and abrasions were consistent with glass-cut wounds that she had previously observed).

# III. Double Jeopardy

[20] George also contends that his convictions for Level 2 felony burglary, Level 3 felony kidnapping, Level 5 felony domestic battery, and Level 5 felony intimidation violated the prohibitions against double jeopardy. In support, George cites to the Indiana Supreme Court's opinion in *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999), for the proposition that multiple criminal enhancements by virtue of possession or use of a single weapon violates the prohibitions against double jeopardy. George's reliance on *Richardson* is misplaced, however, given that the Indiana Supreme Court has held that its decision in *Richardson* does not stand for the proposition argued by George.

[21] In *Sistrunk v. State*, the Indiana Supreme Court explicitly stated the following:

> [O]ur jurisprudence teaches that committing two or more separate offenses each while armed with a deadly weapon—even the same weapon—is not within the category of rules precluding the enhancement of each offense based on "the very same behavior." Stated somewhat differently, our recognition in *Richardson* of the common law rule establishing that enhancements cannot be imposed for the very same behavior could not have included use of a single deadly weapon during the commission of separate offenses. And this is so because no such common law rule existed. Instead the opposite was true.

36 N.E.3d 1051, 1054 (Ind. 2015). The Court also stated in *Gates v. State*, that "[i]t is well established in Indiana that the use of a single deadly weapon during the commission of separate offenses may enhance the level of each offense." 759 N.E.2d 631, 633 n.2 (Ind. 2001).

The level of each of the challenged offenses was elevated because George committed the charged acts either by using or while armed with a deadly weapon. The element causing the elevation of these offenses was not the act of harming someone, but rather was the threat of harm from a deadly weapon. *See White v. State*, 544 N.E.2d 569, 570 (Ind. Ct. App. 1989) (providing that the factor supporting the defendant's enhanced convictions was not the act of harming the victim, but rather the threat of harm from a deadly weapon). That threat occurred during each of the offenses for which George was convicted and, as such, was properly punishable. As we concluded in *White*, "[t]he threats from the weapon were as distinct as if he had robbed a grocery in the morning, raped a victim in the afternoon, and abducted a child in the evening, using the same shotgun to threaten each separate victim." 544 N.E.2d at 570–71.

# IV. Limitation of Cross-Examination

Finally, George contends that the trial court abused its discretion by limiting his cross-examination of L.G. about matters relating to her and George's divorce. "The right to cross-examine witnesses is guaranteed by the Sixth Amendment of the United States Constitution and Article I section 13 of the Indiana Constitution." *Strunk v. State*, 44 N.E.3d 1, 4 (Ind. Ct. App. 2015). The right to cross-examination, however, "is subject to reasonable limitations placed at the discretion of the trial judge." *McQuay v. State*, 566 N.E.2d 542, 543 (Ind. 1991). "The conduct of cross-examination is within the discretion of the trial court, and only a total denial will result in an error of constitutional proportion.

Anything less than a total denial is viewed as a regulation of the scope of cross-examination by the trial court, and will be reviewed for an abuse of discretion." *Strunk*, 44 N.E.3d at 4 (internal quotations omitted).

[24]   In arguing that the trial court abused its discretion in limiting his cross-examination of L.G., George indicates that he sought to present evidence relating to L.G.'s financial interest in the pending divorce to show that she was biased against and had a motive to embellish her allegations against George. Review of the record, however, indicates that while the trial court did limit George's cross-examination of L.G. with regard to certain matters pertaining to the divorce, the trial court allowed George to question L.G. about her withdrawal of money from their joint account. The trial court indicated that with regard to questioning L.G. about the pending divorce, "there's going to be a little leeway, but we're not trying the [divorce] case." Tr. Vol. II p. 13.

[25]   The trial court allowed questions, over the State's objections, regarding the facts that (1) on the day of the incident, L.G. withdrew $1000 from her and George's joint account and (2) she claimed a financial interest in the marital residence. George does not point to any other specific questions that he wanted, but was not permitted, to ask L.G. Thus, we agree with the State's contention that "[b]ased on the record, the jury was well aware that there was a pending divorce, [L.G.] took $1,000 from the joint account, had a financial interest in the marital residence, and had taken money out of their account to 'have fun.'" Appellee's Br. p. 21. George has failed to convince us that the trial court abused its discretion in limiting his cross-examination of L.G.

# Conclusion

[26]    The evidence is sufficient to sustain George's elevated convictions for Level 2 burglary, Level 3 felony kidnapping, Level 5 felony domestic battery, and Level 5 felony intimidation; the trial court did not abuse its discretion in admitting the forensic nurse's challenged testimony; elevation of George's burglary, kidnapping, domestic battery, and intimidation convictions did not violate the prohibitions against double jeopardy; and the trial court did not abuse its discretion in limiting George's cross-examination of L.G.

[27]    The judgment of the trial court is affirmed.

Bailey, J., and Brown, J., concur.