PARIENTE, J., dissenting.
I dissent. I would adopt the view of the Fourth District Court of Appeal in Domville v. State , 103 So.3d 184 (Fla. 4th DCA 2012), that having a lawyer as a Facebook "friend" not only "may undermine confidence in the judge's neutrality" but in this case warranted the judge's recusal based on a "well-founded fear of not receiving a fair and impartial trial." Id. at 186. Even more pointedly, as Judge Gross explained in his concurring specially opinion in granting the motion for certification in Domville :[6]
Judges do not have the unfettered social freedom of teenagers. Central to the public's confidence in the courts is the belief that fair decisions are rendered by an impartial tribunal. Maintenance of the appearance of impartiality requires the avoidance of entanglements and relationships that compromise that appearance. Unlike face to face social interaction, an electronic blip on a social media site can become eternal in the electronic ether of the internet. Posts on a Facebook page might be of a type that a judge should not consider in a given case. The existence of a judge's Facebook page might exert pressure on lawyers or litigants to take direct or indirect action to curry favor with the judge. As we recognized in the panel opinion, a person who accepts the responsibility of being a judge must also accept limitations on personal freedom.
Domville , 125 So.3d at 179 (emphasis supplied) (Gross, J., concurring specially). I wholeheartedly agree.
While Facebook and other social media sites have become more sophisticated, recent history has shown that a judge's involvement with social media is fraught with risk that could undermine confidence in the judge's ability to be a neutral arbiter. For these reasons, I would adopt a strict rule requiring judges to recuse themselves whenever an attorney with whom they are Facebook "friends" appears before them. This rule does little to limit the judge's personal liberty, while advancing the integrity of the judicial *901 branch as the one branch of government that is above politics.
Regardless of the appropriate parameters for a future amendment to the Code of Judicial Conduct relating to use of Facebook and other social media, it is clear that the judge in this case should have recused herself because, at the time of the recusal motion, the only binding opinion was the Fourth District's in Domville . Domville expressly required judges to recuse themselves from cases where they were Facebook friends with the lawyer, 103 So.3d at 185, and the trial judge was required to follow that opinion. See Pardo v. State , 596 So.2d 665, 666 (Fla. 1992).
More importantly and most respectfully, in my view, any attempt to equate Facebook "friendship" with traditional friendship ultimately fails. The fact that both are called "friendship" does not mean they are comparable or can be evaluated in the same manner. Further, obtaining the information required to establish a good faith basis to file a motion for recusal would require discovery that is both impractical and potentially invasive of both the judge's and attorney's privacy.
The premise of the majority opinion is that Facebook friendships and traditional friendships are analogous. But, equating friendships in the real world with friendships in cyberspace is a false equivalency. The existence of a Facebook "friendship" may reveal far more information regarding the intimacy and the closeness of the relationship than the majority would assign it. For example, as the majority explains, once a person becomes "friends" with another Facebook user, that person gains access to all of the personal information on the user's profile page-including photographs, status updates, likes, dislikes, work information, school history, digital images, videos, content from other websites, and a host of other information-even when the user opts to make all of his or her information private to the general public. Majority op. at 894-96; see also Daniel Smith, When Everyone is the Judge's Pal: Facebook Friendship and the Appearance of Impropriety Standard , 3 Case W. Res. J. L. Tech. & Internet 183, 200-06 (2011). Additionally, the ease of access to the "friend's" information allows Facebook "friends" to be privy to considerably more information, including potentially personal information, on an almost daily basis.
Social media communication is quickly replacing other modes of casual communication. See Smith, supra , at 200-06. Moreover, information conveyed on social media can range from the frivolous-gossip and what someone ate for dinner-to the meaningful-updates on family, friends, or even world events.
Facebook also gives the public a new way to scrutinize public figures. Politicians, for instance, have become painfully aware of the downsides of maintaining an Internet persona. Numerous candidates have been forced to deal with unbecoming photographs coming to the public's attention through either their own Facebook use or postings by other users. One candidate even found himself apologizing for his college-aged son's unremarkable underage drinking.
Id. at 188-89 (footnotes omitted).
Instead of attempting to compare social media communication and friendship to traditional communication and friendship when determining the appropriate social media policy for the judiciary, this Court should consider the elusive and public nature of Facebook "friendship," as both the Fourth District and the Florida Judicial Ethics Advisory Committee (JEAC) did. See Domville , 103 So.3d at 185-86 ; Fla. JEAC Op. 2010-06 (Mar. 26, 2010); Fla. JEAC Op. 2009-20 (Nov. 17, 2009). As *902 those opinions correctly concluded, when those differences are taken into account, it is clear that judges' Facebook "friendships" with attorneys who appear in their courtrooms can easily cause an appearance of impropriety.
Florida's Code of Judicial Conduct requires that judges "avoid impropriety and the appearance of impropriety in all of the judge's activities." Fla. Code of Jud. Con. Canon 2. Additionally, Canon 2B states: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge ." Fla. Code Jud. Conduct, Canon 2B (emphasis supplied). The commentary to Canon 2A explains:
A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
As the JEAC concluded:
The Committee notes, in coming to this conclusion, that social networking sites are broadly available for viewing on the internet. Thus, it is clear that many persons viewing the site will not be judges and will not be familiar with the Code, its recusal provisions, and other requirements which seek to assure the judge's impartiality. However, the test for Canon 2B is not whether the judge intends to convey the impression that another person is in a position to influence the judge, but rather whether the message conveyed to others, as viewed by the recipient, conveys the impression that someone is in a special position to influence the judge. Viewed in this way, the Committee concludes that identifying lawyers who may appear before a judge as "friends" on a social networking site, if that relationship is disclosed to anyone other than the judge by virtue of the information being available for viewing on the internet, violates Canon 2(B).
Fla. JEAC Op. 2009-20 (Nov. 17, 2009).
This dissent should not be viewed as an attack on the responsible use of social media. I emphasize, as did the JEAC, that the selection and rejection function is what causes the potential for the appearance of impropriety, after the judge has established the social networking profile that affords the judge the ability to accept or reject "friends." As the JEAC explained,
With regard to a social networking site, in order to fall within the prohibition of Canon 2B, the Committee believes that three elements must be present. First, the judge must establish the social networking page. Second, the site must afford the judge the right to accept or reject contacts or "friends" on the judge's page, or denominate the judge as a "friend" on another member's page. Third, the identity of the "friends" or contacts selected by the judge, and the judge's having denominated himself or herself as a "friend" on another's page, must then be communicated to others. Typically, this third element is fulfilled because each of a judge's "friends" may see on the judge's page who the judge's other "friends" are. Similarly, all "friends" of another user may see that the judge is also a "friend" of that user. It is this selection and communication process, the Committee believes, that violates Canon 2B, because the judge, by so doing, conveys or permits others to convey the impression that they are in a special position to influence the judge.
Id.
Clearly, social media plays an important role in today's society. For example, this *903 Court and The Florida Bar as well as many other groups have public Facebook pages that are useful to disseminate information and enhance the role of judges, lawyers, and the judiciary in the public domain. Significantly, individuals may only "follow" these pages, but cannot become Facebook "friends" with either organization. This allows the general public to be privy to any and all information posted on the page without the appearance of impropriety that accompanies self-selection. Judges could, likewise, create pages that follow this model.[7]
As a practical matter, it is unrealistic to require discovery into the extent of social media "friendship" as a prerequisite to recusal before a valid motion may be filed. An individual judge's social media, whether it is Facebook, LinkedIn, Instagram, or any other site, is fraught with concerns for the average litigant because it is difficult and intrusive for a litigant to determine with whom the judge has connected, with whom the judge has declined to connect, and what type of communication the judge engages in on these platforms.
If the Court is declining to follow the JEAC advisory opinions, then I urge that it at least adopt parameters for judges to follow when engaging with social media, similar to those adopted in California.[8] And even if the majority does allow judges to continue to use social media, then it should institute a rule similar to that espoused by Connecticut, which concluded that when new judicial officials wish to return to electronic social media following investiture, the judicial official must
terminate permanently the existing account and start anew. If this course of action cannot be accomplished, the Judicial Official should edit his/her profile page upon reactivation to ensure that it is in compliance with the conditions of this opinion in every respect. This includes, but is not limited to, removing inappropriate contacts, photos, links, comments, petitions, "friending," and "Check In" postings. A Judicial Official *904 should monitor closely new developments with respect to the [electronic social media] and keep abreast of applications instituted by the site managers. The Judicial Official also should monitor his/her participation with respect to maintaining appropriate dignity as well as insuring the precedence of the judicial office.
See Conn. Jud. Ethics Comm. Op. 2013-06 (Mar. 22, 2013).
Judges in Florida are non-partisan and held to the strictest compliance with the Code of Judicial Conduct to avoid even the appearance of impropriety. Judges, unlike the general public and even other elected officials, accept the responsibility when they take the oath of office and don their black robes that many prior activities may have to be limited for the purpose of maintaining the integrity of our justice system. One of these activities should include the use of social media to communicate, either actively or passively, with attorneys who appear before them. Because public trust in the impartiality and fairness of the judicial system is of the utmost importance, this Court should err on the side of caution.
CONCLUSION
The bottom line is that because of their indeterminate nature and the real possibility of impropriety, social media friendships between judges and lawyers who appear in the judge's courtroom should not be permitted. Under this rule, the opposing litigant would not be required to delve into how close the Facebook friendship may be, the judge avoids any appearance of impropriety, and Florida's courts are spared from any unnecessary questions regarding the integrity of our judiciary. Regardless, in this case, the judge was required to recuse herself because of binding precedent. Thus, I would quash the Third District Court of Appeal's decision in Law Offices of Herssein & Herssein, P.A. v. United Services Automobile Ass'n , 229 So.3d 408 (Fla. 3d DCA 2017), and approve the Fourth District's decision in Domville .
Accordingly, I dissent.
LEWIS and QUINCE, JJ., concur.

Following its opinion in Domville , the Fourth District certified the following question of great public importance:
Where the presiding judge in a criminal case has accepted the prosecutor assigned to the case as a Facebook "friend," would a reasonably prudent person fear that he could not get a fair and impartial trial, so that the defendant's motion for disqualification should be granted?
Domville v. State , 125 So.3d 178, 179 (Fla. 4th DCA 2013). However, this Court declined review. State v. Domville , 110 So.3d 441 (Fla. 2013).

"Following" does not involve or require acceptance by the person; it only allows you to see what that person decides to post on his or her public "Wall." If you choose to follow someone, that person's public posts will be automatically delivered to your daily feed. Conversely the person being followed will not see what the followers post (unless he or she follows them back), and the followers will not be able to access anything else that the person keeps on his or her private page. See Follow , Facebook Help Ctr., https://www.facebook.com/help/382751108453953/?ref=u2u (last visited Aug. 30, 2018).

The California Judicial Ethics Committee considers the following factors in determining whether the attorney is in a special position to influence the judge and cast doubt on the judge's ability to be impartial:
1) The nature of the social networking site The more personal the nature of the page, the greater the likelihood that including an attorney would create the appearance that the judge would be in a special position to influence the judge, or cast doubt on the judge's ability to act impartially.
2) The number of "friends" on the page The greater the number of "friends" on the judge's page the less likely it is one could reasonably perceive that any individual participant is in a position to influence the judge.
3) The judge's practice in determining whom to include As with the number of people on the page, the more inclusive the page the less likely it is to create the impression that any individual member is in a special position to influence the judge.
4) How regularly the attorney appears before the judge If the likelihood that the attorney will actually appear before the judge is low, the more likely it is that the interaction would be permissible. On the other hand, if the attorney appears frequently before the judge the interaction is less likely to be permissible.
See Cal. Jud. Ethics Comm. Op. 66, at 8 (Nov. 23, 2010).